IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
JUDGE WALKER D. MILLER

Civil Action No. 06-cv-00607-WDM-CBS

CANDY WILSON,

Plaintiff,

v.

THE ALAMOSA SCHOOL DISTRICT, a political subdivision,

Defendant.

---

**ORDER ON MOTION FOR SUMMARY JUDGMENT**

---

Miller, J.

This matter is before me on the Motion for Summary Judgment (doc no 46) filed by Defendant the Alamosa School District RE–11J (the "District"). Plaintiff opposes the motion. Upon review of the parties' filings, I conclude oral argument is not required. For the reasons that follow, the motion is denied.

Background

Plaintiff has worked for the District since 1984.[1] She has worked as a teacher, coach, and Associate Principal ("AP"). As an AP, Plaintiff had primary responsibility for discipline and truancy issues. In her career, she made several efforts at transfers and promotions. In 1998, she applied for and received the position as the Principal of a middle school in another school district. After accepting the position, she learned that

---

[1]The facts set forth here are drawn from the parties' briefs and are undisputed unless otherwise noted.

she had a lump in her breast and might have to undergo surgery or chemotherapy. Accordingly, she turned down the new job and stayed with the District. In 1999, she became an AP at Alamosa High School. In 2001, Plaintiff again applied to transfer to a Principal position at another high school but withdrew her transfer request approximately nine days later. In 2002, Plaintiff requested a transfer to a position of Associate Principal/Athletic Director at her school, which was granted. Before making the transfer request, she had arranged with the then-Principal of the school, Dennis Lopez, that he would assume some of her responsibilities when needed so that she could attend her son's football games. However, after Plaintiff accepted the position, Lopez resigned as Principal. In addition, Plaintiff discovered that the job entailed a number of responsibilities that she had not previously been informed of; accordingly, she turned down the transfer.

Starting in 2000, Henry Herrera ("Herrera") was the Superintendent of the District. As Superintendent, Herrera had final authority to approve assignments and transfers of licensed District employees. He also made recommendations to the Board of Education, which had final authority concerning hiring and termination of licensed District employees. Herrera approved several of Plaintiff's reassignment requests.

In January 2004, Plaintiff requested in writing to be transferred to a position as Principal at Polston Elementary School in the District. Plaintiff and Herrera spoke around that time and she told him she was tired and ready for a change from her AP duties. Virginia Goddard ("Goddard"), the Principal at Alamosa High School at the time, testified in her deposition that Plaintiff reported being stressed out by the

discipline aspects of the AP position, but Plaintiff disputes this. Herrera approved Plaintiff's transfer request and Plaintiff accepted the position. Her transfer was announced to District staff and small receptions and welcome events were done at the high school and new elementary school. Herrera began recruiting for the high school AP position.

In March 2004, during spring break, Plaintiff contacted Herrera and said she needed to speak with him. They arranged a meeting at his house on March 18, 2004. When she arrived, Plaintiff was tearful and appeared stressed and sad. She informed Herrera that she was experiencing anxiety attacks and other difficulties, including heart palpitations and insomnia, and did not want to start a new job while she was feeling this way. She told him she wanted to stay in her current position, since she knew the work and could manage it. Plaintiff also informed Herrera she was taking medication to treat the anxiety. Herrera stated that he was sure she could do the new job. He then asked to go with her to her home to speak with her and her husband. Plaintiff's husband is a school administrator in another school district. Plaintiff's husband and Herrera both reassured Plaintiff that she could do the Principal job and that she would find it more enjoyable in many respects than the AP job. Herrara asked Plaintiff to take some time to think about her decision but encouraged her to go to the new job at Polston.

There is additional disputed evidence about what occurred in these discussions, including that Herrera considered Plaintiff to be "emotionally unstable" at the meeting and that he repeatedly asked if she was taking Prozac. Plaintiff and her husband offer evidence that Herrera promised Plaintiff she could stay at Alamosa High School as an

AP if she wanted, which Herrera denies. Plaintiff's husband described Herrara as being "fixated" on Plaintiff's mental health condition.

Plaintiff returned to work after spring break and there is no evidence that her performance suffered in any way. Around April 2, 2004, Plaintiff told Herrera that she had made a final decision not to take the Principal position. Plaintiff contends that Herrera told her she did not need to put this information in writing, which Herrera disputes. At some point, Herrera told Plaintiff to draft a letter to the school board explaining her decision to turn down the transfer. According to Plaintiff, Herrera told her not to include his agreement to permit her to stay as an AP at Alamosa High School, which Herrera also denies.

On April 6, 2004, Herrera attended a School Board meeting to discuss Plaintiff. Herrera decided before the meeting that Plaintiff should not continue as an AP. According to Herrera, he made this decision because he had lost confidence in her decision-making and follow-through, as a result of her history of seeking transfers and then changing her mind. Disputed evidence shows that during an executive session at the Board meeting, Herrera told the Board that Plaintiff was having anxiety attacks, was under considerable stress, was emotionally unstable and medicated. Despite Goddard's willingness to have Plaintiff return as an AP, Herrera informed the School Board that he did not want Plaintiff to continue as an AP or to go to Polston. There is also disputed evidence that he told the Board he did not even want Plaintiff to finish the school year.

After the meeting, around 10:30 p.m., Herrera asked Plaintiff to meet him and

the assistant Superintendent, John Keane, at the District's administrative office. The parties dispute what was said in the meeting. According to Herrera, he informed Plaintiff that the Board was disappointed with her, that he had lost confidence in her as an administrator, that her decision hurt her credibility, and that she would not return as an AP the next school year. Plaintiff states that he told her that he was concerned about her health and mental health and that he was afraid she would have a nervous breakdown. In addition, he told her she would not be allowed either position because he thought she was too sick to do her job. He suggested that she resign from the District or take medical leave.

According to Keane and Herrera, Plaintiff believed Goddard was responsible for the decision to not return Plaintiff to the AP job and expressed anger towards her. Plaintiff denies this. Herrera contends that he then decided that Plaintiff would not be permitted to finish the school year because she might undermine Goddard, although there is evidence he had made this decision before the Board meeting.

In a letter to Plaintiff dated April 7, 2004, Herrera denied Plaintiff's request to remain in her AP position, citing the three occasions that she requested and obtained reassignment and then turned them down. The letter goes on to say, "From this brief history, your actions have seriously called into question your ability ot make decisions, stick to them, and carry them out. Also, I am seriously concerned about your health, and, in particular, the anxiety attacks you shared that you have been experiencing." Herrera further stated, "I am no longer confident that you have the capacity to function as a building level administrator." The letter informs Plaintiff that she would be

reassigned for the remainder of the year as administrative support and in the following school year would be reassigned as a classroom teacher.

In his deposition, Herrera testified that he did not know the reasons that Plaintiff had changed her mind about the previous transfer requests and did not attempt to find out before making his decision or writing the letter. It is undisputed that Herrera had never previously raised concerns about Plaintiff's decision-making and conceded in his deposition that he did not observe Plaintiff to have any problems with decision-making in her role as an AP.

On April 13, 2004, Keane and Herrera had another meeting with Plaintiff. According to Plaintiff, Herrera again stated concerns about Plaintiff's health, mental health and his belief that she was on the verge of having a nervous breakdown. He again asked her to resign. It is undisputed that at the meeting, Herrera directed Plaintiff not to enter any school building, not to have contact during the workday with any staff, not to attend school related activities, and to return office items and materials, including work on a grant that Plaintiff had traditionally obtained for the District. Plaintiff was instructed she would work from home for the remainder of the school year. After imposing the restrictions, Herrera informed her she would be arrested if she attempted to enter school grounds. According to Plaintiff, Herrera also told her that if she attempted to apply for any position with another school district, Herrera would inform the administrators about her health problems.

Herrera also met with the faculty and staff members at Alamosa High School around April 13. There is disputed evidence that Herrera reported or implied that

Plaintiff suffered from anxiety attacks, that she had been removed from her position for health reasons, and that her health was "too fragile" for her to be able to finish the school year.

Plaintiff completed projects from home for the rest of the year and began teaching at a middle school in the District the following school year, where she has continued to teach up to the present.

After exhausting her administrative remedies, Plaintiff filed this action against Herrera and the District. Herrera has been dismissed from the case. In her Second Amended Complaint, which now governs, Plaintiff asserts a single claim of discrimination in violation of the Americans with Disabilities Act ("ADA"), alleging that Herrera regarded her as disabled.

## Standard of Review

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. A factual issue is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

Where "the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden at the summary judgment stage by identifying 'a lack of evidence for the nonmovant on an essential element of the nonmovant's claim.'" *Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1115 (10th Cir. 2001) (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998)). Then, "[t]o avoid

summary judgment, the nonmovant must establish, at a minimum, an inference of the presence of each element essential to the case." *Id*.

A plaintiff alleging employment discrimination may prove intentional discrimination by direct or indirect evidence. In the absence of direct evidence, the analysis set forth in *McDonnell Douglas Corp v. Green*, 411 U.S. 792, 802-804 (1973), provides the framework for assessing indirect, or circumstantial, evidence. *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1226 (10th Cir. 2000); *MacKenzie v. City and County of Denver*, 414 F.3d 1266, 1274 (10th Cir. 2005) (*McDonnell Douglas* burden-shifting approach applies in ADA cases in the absence of direct evidence). *See generally St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506-508 (1993); *McDonnell Douglas Corp. v. Green*, 411 U.S. at 802-804. Under this analysis, the plaintiff bears the initial burden of presenting a *prima facie* case of discrimination. *Kendrick,* 220 F.3d at 1226. If the plaintiff establishes a *prima facie* case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason" for its action. *Id*. at 1226 (quoting *McDonnell Douglas*, 411 U.S. at 802). If the defendant presents such a reason, the plaintiff bears the "ultimate burden" of establishing that these proffered reasons are a pretext for unlawful discrimination. *Munoz v. St. Mary-Corwin Hosp.*, 221 F.3d 1160, 1167 (10th Cir. 2000).

The plaintiff may show pretext by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy or credence and hence that the employer did not act for the

asserted non-discriminatory reasons." *Jaramillo v. Colorado Judicial Dept.*, 427 F.3d 1303, 1308 (10th Cir. 2005); *see also Kendrick*, 220 F.3d at 1230 (three ways of showing pretext are: (1) evidence that the defendant's stated reason for the adverse action was false; (2) evidence that the defendant acted contrary to a written company policy prescribing the action to be taken under the circumstances; or (3) evidence that defendant acted contrary to an unwritten policy or practice when making the adverse decision).

Discussion

The District moves for summary judgment on the grounds that Plaintiff cannot show that she is disabled, as defined by the ADA. In the alternative, the District contends that there is no genuine issue of material fact as to whether its stated non-discriminatory reason for demoting Plaintiff was a pretext for unlawful discrimination.

To prevail on an ADA claim, a plaintiff must establish: (1) she is a disabled person as defined by the ADA; (2) she is qualified, with or without reasonable accommodation, to perform the essential functions of the job held or desired; and (3) her employer discriminated against her because of her disability. *Butler v. City of Prairie Village*, 172 F.3d 736, 748 (10th Cir. 1999). "Disability" is defined broadly in the statute as (1) a physical or mental impairment that substantially limits one or more of the major life activities; (2) a record of such an impairment; or (3) being regarded as having such an impairment. 42 U.S.C. § 12102(2). Plaintiff does not claim that she has an impairment that substantially limits a major life activity, but rather that the District, through Herrera, regarded her as having such an impairment. *See Sutton v.*

*United Air Lines, Inc.,* 527 U.S. 471, 489 (1999) (the "regarded as" standard is met when an employer "mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities"). In the Second Amended Complaint, she alleges that Herrera perceived her to suffer from mental impairments which impaired the major life activities of working, thinking, and interacting with others.

To be substantially limited in a major life activity, the individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives. *Toyota Motor Mfg., Ky., Inc. v. Williams,* 534 U.S. 184, 198 (2002). The impairment must be permanent or long term. *Id*. Although "working" has generally been recognized as a major life activity, in order to prevail on a "regarded as" claim, a plaintiff must do more than show that the defendant perceived the plaintiff as unable to perform a single job. *E.E.O.C. v. Heartway Corp.*, 466 F.3d 1156, 1162 (10th Cir. 2006). Rather, the plaintiff must prove by a preponderance of the evidence that the employer perceived the employee's condition as "significantly restrict[ing]" her "ability to perform either a class of jobs or a broad range of jobs" as compared to similarly trained persons.[2] *Id*. This inquiry has a

---

[2]What constitutes a "class of jobs" is an objective inquiry, and, according to guidance from the E.E.O.C., includes categories such as "heavy labor jobs," "jobs that involve manual labor," "semi-skilled jobs," and "jobs requiring the use of a computer." *Heartway Corp.*, 466 F.3d at 1163 n. 6 (citing E.E.O.C. Compliance manual). A "class of jobs" is defined as "[t]he job from which the individual has been disqualified because of an impairment, and the number of and types of jobs utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment." 29 C.F.R. § 1630.2(j)(3)(ii)(B). A broad range of jobs in various classes is defined as "[t]he job from which the individual has been disqualified because of an impairment, and the number of and types of jobs not utilizing similar training, knowledge, skills or abilities, within that geographical area,

strong subjective component, as it requires showing the state of mind of the decision-maker. *Id*. at 1163.

The District argues first that Herrera only stated generalized concern for Plaintiff's condition, and such caring for employees should not be grounds for liability. However, there are numerous issues of material fact in this regard. A reasonable jury could credit evidence that Herrera believed that Plaintiff's condition was significantly more serious than it was, based on misconceptions and stereotypes about depression or mental illness. Evidence that he told her that he believed she was on the verge of a nervous breakdown, that he told staff she was "too fragile" to continue work, and that he suddenly distrusted her decisionmaking abilities after learning of her health conditions (but never had before, even after similar changes of heart as to proposed transfers), would be a reasonable basis for a jury to conclude that Herrera's statements went far beyond generalized, humanitarian statements of concern about her health condition.

The District next contends that the evidence does not demonstrate that Herrera or the District believed she had a condition that prevented her from working a class of jobs or broad range of jobs in different classes, as evidenced by the District's reassigning her to a teaching position and permitting her to return to her job as an AP after her initial meeting with Herrera on March 18. The District argues that the only reason Herrera prohibited Plaintiff from finishing the school year was because of his

---

from which the individual is also disqualified because of the impairment." 29 C.F.R. § 1630.2(j)(3)(ii)(C). I will assume without deciding that "jobs in the educational field" or "administrative decision-making jobs" are classes of jobs.

concern that she would be angry at and undermine the authority of Goddard. Finally, the District argues that none of the evidence demonstrates that Herrera believed that Plaintiff had a long term problem.

Again, there is evidence from which a reasonable jury could conclude that Herrera believed that Plaintiff had a mental impairment that precluded her from working a class or broad range of jobs. There is evidence that he encouraged her to resign and to take an extended medical leave, indicating that he considered her incapable of working at all. Disputed evidence, if credited, shows that he told others he removed her from her position because of her health and told her that he would prevent her from seeking jobs in other districts. Again, his sudden decision that he could no longer trust her decisionmaking, only after learning of her anxiety and treatment, could reasonably support an inference that he viewed her as incapable of working a broad range of jobs involving responsibility and decisionmaking. In addition, Plaintiff argues that the District allowed her to continue teaching only because she has vested tenure and that this fact is not dispositive of Herrera's belief. Moreover, in view of the extreme restrictions Herrera placed on her, including prohibiting her from finishing the semester or even appearing at school, a jury could well believe that Herrera thought Plaintiff was not capable of performing any work at the school. *See Doebele v. Sprint/United Management Co.,* 342 F.3d 1117, 1134-35 (10th Cir. 2003) (plaintiff's supervisors' belief that her mental impairments posed a threat to other employees, combined with evidence that they refused to consider accommodations or to offer her another position, could support inference that they viewed her as substantially limited in her ability to

perform a broad range of jobs).

The District also argues that it had a legitimate, non-discriminatory reason for demoting Plaintiff and that Plaintiff cannot show that this reason was pretextual. Specifically, the District contends that Herrera believed that she could not perform effectively as a school administrator. Again, there are significant factual disputes in this regard. The District argues that Herrera did not want to put Plaintiff back into a position that caused her stress; however, Plaintiff maintains that she was not stressed by her AP job, but simply did not want to start a new job while handling an unexplained anxiety condition. There are also factual disputes as to the basis for Herrera removing Plaintiff from her position and barring her from the school and school functions. A reasonable jury could conclude that Herrera's alleged lack of confidence in Plaintiff was in fact due to his belief that she suffered from a mental impairment and discriminated against her on that basis.

Accordingly, it is ordered:

1. Defendant's Motion for Summary Judgment (doc no 46) is denied.

DATED at Denver, Colorado, on August 17, 2007.

BY THE COURT:

s/ Walker D. Miller
United States District Judge